LESTER BOTTONE, JR. *v.* TOWN OF WESTPORT ET AL.
(13370)

PETERS, C. J., HEALEY, SHEA, GLASS and COVELLO, Js.

Argued October 13, 1988—decision released January 24, 1989

*Keith D. Dunnigan,* with whom, on the brief, was *Stephen L. Savarese,* for the appellant (named defendant).

*Lawrence P. Weisman,* for the appellee (plaintiff).

ARTHUR H. HEALEY, J. The sole issue in this case is whether General Statutes § 7-147, as it existed on January 12, 1988,[1] was unconstitutional. On January 12,

---

[1] General Statutes (Rev. to 1987) § 7-147 provided: "PROHIBITION OF OBSTRUCTIONS IN WATERWAYS. Any town, city or borough may, within its jurisdiction, establish by ordinance lines along any part of any waterway beyond which, in the direction of the waterway, no permanent obstruction or encroachment shall be placed by any private person or any firm or corporation, unless permission is granted in writing by the legislative body of the town, city or borough. Wherever there is a city or borough within a town, the town shall have authority to establish such lines for such of its area as is not within such city or borough, and the city or borough shall have such authority within its boundaries. Any two or more adjoining municipalities shall have authority to investigate jointly the desirability of establishing lines on either or both sides of a waterway within their jurisdiction. Any private person or any firm or corporation aggrieved by any decision of a legislative body made in accordance with this section may, within thirty days after notice thereof, appeal from such decision in the manner provided by section 8-8 for appeal from the decisions of a municipal zoning board of appeals. Nothing contained in this section shall limit or restrict the commissioner of transportation in exercising his authority over the harbors and

1988, the trial court, *Fuller, J.,* found that the statute lacked sufficient standards to guide municipalities in enacting waterway protection ordinances under it and thus held the statute to be an unconstitutional delegation of legislative authority. We disagree.

Lester Bottone, Jr., is the record title owner of two building lots in the town of Westport. The two parcels of land abut the town of Norwalk on their westerly side, and a stream passes through one of the lots and near the other. Both lots have frontage on Belaire Drive and slope downhill from the road toward the stream. Although the parcels contain soils designated as inland wetlands under the Inland Wetlands and Watercourses Act; General Statutes §§ 22a-36 through 22a-45; the subdivision in which the lots are located was approved prior to the effective date of the inland wetlands regulations and, therefore, the lots are exempt from those regulations. The town, however, claims that the lots are subject to Westport's Waterway Protection Lines Ordinance (WPLO), Westport Code §§ 148-1 through 148-17, as amended January 14, 1983.

Westport Code § 148-1 sets forth the purpose of the waterway protection lines.[2] The ordinance was designed to protect the town's waterways "from activities that would cause hazards to life and property and/or activities having adverse impact upon the flood-carrying and

navigable waters of the state, nor apply to any dam, bridge, pipeline or other similar structure, and appurtenances thereto, extending across any waterway, which are otherwise in compliance with law."

In light of the trial court's decision in this case, the legislature repealed General Statutes § 7-147 and substituted a new § 7-147 to comply with the trial court's holding. See Public Acts 1988, No. 88-327 (effective June 3, 1988); 31 H.R. Proc., Pt. 13, 1988 Sess., pp. 4416–17. For the purposes of this opinion, all references to General Statutes § 7-147 are to that section as it existed prior to the trial court's decision on January 12, 1988.

[2] The Waterway Protection Lines Ordinance was made part of the record after the trial court granted the named defendant's motion for rectification that was filed on May 10, 1988.

water storage capacity of the waterways, the flood heights and the natural resources and ecosystems of the Town of Westport." Westport Code § 148-1. Section 148-2 of the code defines "waterway" as "[a]ny river, stream, brook watercourse or tributary . . . ." The protection lines under the ordinance are set at the twenty-five year storm flood elevation. Westport Code § 148-3. To protect the waterways, the code prohibits the following activities: "dumping, filling and transferring of any materials and the encroachment by any construction, building or portion of building or other permanent structure(s) within said waterway protection lines." Westport Code § 148-5.

Sections 148-7 through 148-12 control the application and review process for a party who desires to conduct otherwise prohibited activity. In overview, the process involves an application that is reviewed by the flood and erosion control board and the conservation commission. Westport Code § 148-7. The applicant must supply information to show that the proposed conduct will not cause conditions hazardous to life or property and will not have an adverse impact on the town's waterways and natural resources. Westport Code §§ 148-8, 148-9. Without review by a representative town meeting, the decision of the flood and erosion control board and the conservation commission is deemed approved by the representative town meeting. The representative town meeting, however, does have authority to review and reverse a decision by the board and commission. Westport Code § 148-10. An appeal can be taken from a decision of the flood and erosion control board, the conservation commission or the representative town meeting in the manner provided for appeals from a municipal zoning board of appeals pursuant to General Statutes § 8-8. Westport Code § 148-13.

It is undisputed that the plaintiff cannot construct a residence on his property with the required primary

and secondary reserve area for the septic system without infringing on the waterway protection lines. The plaintiff applied to the defendant conservation commission for permission to construct a single-family residence on each of his two lots. On November 4, 1986, the commission denied the plaintiff's application "with prejudice" because the proposed construction was inconsistent with the WPLO. The plaintiff filed this action for declaratory relief and simultaneously filed two other actions. In one action, the plaintiff appealed the commission's decision to the Superior Court; *Bottone* v. *Conservation Commission,* Superior Court, judicial district of Stamford-Norwalk, Docket No. CV86-0084838S; pursuant to Westport Code § 148-13. The other action was one for monetary damages claiming an unconstitutional taking of property. *Bottone* v. *Westport,* Superior Court, judicial district of Stamford-Norwalk, Docket No. CV86-0084910S. At this point, only the action for declaratory relief has been heard.[3]

Paragraph seven of the plaintiff's complaint alleged that General Statutes § 7-147, the enabling statute for the WPLO, was unconstitutional in that it violated his rights to due process under the fifth and fourteenth amendments to the United States constitution. Specifically, the plaintiff claimed that the statute "fail[ed] to provide standards or criteria sufficient to guarantee its uniform and consistent application and administration and [was] impermissibly vague." In addition, in paragraph eight of his complaint, the plaintiff challenged the statute on the following grounds: (a) the enabling act was unconstitutional because it was vague, overbroad and devoid of standards; (b) the delegation of power to the town was unconstitutional because it

---

[3] Because this action questioned the validity of General Statutes § 7-147, the court ordered that notice be sent to all towns, cities and boroughs in the state. The trial court found that actual notice had been given to all interested parties but none joined the action.

did not define the limits of the authority delegated; (c) the statute amounted to a taking without just compensation; (d) the jurisdiction of the department of environmental protection and inland wetlands agencies preempted regulation of all such waterways and watercourses; and (e) the statute failed to provide for adequate notice and for a public hearing. The plaintiff also challenged the WPLO on these same grounds. The only issue before this court is whether § 7-147 was constitutional. The trial court did not address the legality of the ordinance because it found a more fundamental defect in the enactment of the ordinance—a constitutional defect in the enabling act. See *Santoro* v. *Rockwell,* 14 Conn. Sup. 379, 383 (1947). Therefore, we will confine our review to the constitutionality of § 7-147.

Our examination of § 7-147 is guided by the maxim that "[i]n passing upon the constitutionality of a legislative act, we will make every presumption and intendment in favor of its validity . . . ." *New Milford* v. *SCA Services of Connecticut, Inc.,* 174 Conn. 146, 148, 384 A.2d 337 (1977); *Aunt Hack Ridge Estates, Inc.* v. *Planning Commission,* 160 Conn. 109, 112, 273 A.2d 880 (1970); *Edwards* v. *Hartford,* 145 Conn. 141, 145, 139 A.2d 599 (1958). This strong presumption of validity is particularly applicable to police power legislation. 6 E. McQuillin, Municipal Corporations § 24.31 (3d Ed. Rev.); see also 1 R. Anderson, American Law of Zoning § 3.14 (3d Ed. Rev. 1986); 1 P. Rohan, Zoning and Land Use Controls § 1.02[4] n.60 (1988 Rev.).

The party challenging a statute's constitutionality has a heavy burden of proof; the unconstitutionality must be proven beyond all reasonable doubt. *State Management Assn. of Connecticut, Inc.* v. *O'Neill,* 204 Conn. 746, 758, 529 A.2d 1276 (1987); *State* v. *Hernandez,* 204 Conn. 377, 385, 528 A.2d 794 (1987); *University of Connecticut Chapter, AAUP* v. *Governor,* 200 Conn. 386, 390, 512 A.2d 152 (1986); *Keogh* v. *Bridgeport,* 187

Conn. 53, 60, 444 A.2d 225 (1982); 1 R. Anderson, supra, § 3.22. Additionally, in a vagueness challenge, such as this, civil statutes can be less specific than criminal statutes and still pass constitutional muster. See *State Management Assn. of Connecticut, Inc.* v. *O'Neill,* supra, 757. To prove that a statute is unconstitutionally vague, the challenging party must establish that an ordinary person is not able to know what conduct is permitted and prohibited under the statute. Id., 758; *Gunther* v. *Dubno,* 195 Conn. 284, 297–98, 487 A.2d 1080 (1985). The fact that the meaning of the language is fairly debatable is not enough to satisfy the burden of proof. See *Blue Sky Bar, Inc.* v. *Stratford,* 203 Conn. 14, 23, 523 A.2d 467 (1987); see also 1 R. Anderson, supra, § 3.20.

In order for municipalities to have local control over waterways within their boundaries, the state legislature had to enact a statute authorizing such control. In the absence of an express grant of power from the state, municipalities do not have authority to legislate. *Buonocore* v. *Branford,* 192 Conn. 399, 402, 471 A.2d 961 (1984); *City Council* v. *Hall,* 180 Conn. 243, 248, 429 A.2d 481 (1980); see 6A E. McQuillin, supra, § 24.35. There is no question that a state legislature can delegate its authority to municipalities, particularly for local matters pertaining to health, safety and general welfare. *Blue Sky Bar, Inc.* v. *Stratford,* supra, 19–20; *State* v. *Gordon,* 143 Conn. 698, 706, 125 A.2d 477 (1956); *Redevelopment Agency* v. *Shepard,* 75 Cal. App. 3d 453, 459, 142 Cal. Rptr. 212 (1977); *People* v. *Moreira,* 70 Misc. 2d 68, 69, 333 N.Y.S.2d 215 (1972); *Treants Enterprises, Inc.* v. *Onslow County,* 320 N.C. 776, 778, 360 S.E.2d 783 (1987); *Southern Valley Grain Dealers* v. *Board of County Commissioners,* 257 N.W.2d 425, 434 (N.D. 1977); *DePetrillo* v. *Coffey,* 118 R.I. 519, 376 A.2d 317 (1977); 6A E. McQuillin, supra, § 24.37. We must now determine what level of specificity is

required in a delegation of legislative authority by a civil statute from the state to a municipality, and whether § 7-147 met that standard.

The most often cited rule governing the constitutionality of legislative delegations in Connecticut comes from the 1940 case of *State* v. *Stoddard,* 126 Conn. 623, 13 A.2d 586 (1940). In its memorandum of decision in this case, the trial court relied upon *Stoddard* and its progeny. In *State* v. *Stoddard,* this court was called upon to determine the constitutionality of a portion of chapter 107a of the General Statutes, which prescribed the duties of the milk administrator. General Statutes (Cum. Sup. 1935) §§ 796c and 797c provided for a milk administrator to be appointed by the governor with the advice and consent of the General Assembly. The section of the statute at issue in *Stoddard* was General Statutes (Cum. Sup. 1937) § 493d which delineated the powers of the milk administrator to establish prices.[4]

In finding an unconstitutional delegation of power to the milk administrator under the act, the court stated: "In order to render admissible such delegation of legislative power . . . it is necessary that the statute declare a legislative policy, establish primary standards for carrying it out, or lay down an intelligible principle to which the administrative officer or body must conform . . . ." *State* v. *Stoddard,* supra, 628. It is this rule that has been cited in this state as a canon of interpretation for virtually all delegations of legislative power. See, e.g., *State* v. *White,* 204 Conn. 410, 419, 528 A.2d 811 (1987); *New Milford* v. *SCA Services of Connecticut, Inc.,* supra, 149; *Mitchell* v. *King,* 169

---

[4] General Statutes (Cum. Sup. 1937) § 493d provides: "MINIMUM PRICE. The first sentence of section 801c is amended to read as follows: Said administrator shall have power to establish, from time to time, a minimum price for the different milk areas of the state for each class and grade of milk or milk products sold to dealers and shall have power to define the number and type of classes of milk for the purposes of this chapter."

Conn. 140, 142, 363 A.2d 68 (1975); *Kellems* v. *Brown,* 163 Conn. 478, 499, 313 A.2d 53 (1972); *Aunt Hack Ridge Estates, Inc.* v. *Planning Commission,* supra, 114; *Jennings* v. *Connecticut Light & Power Co.,* 140 Conn. 650, 670, 103 A.2d 535 (1954); *Santoro* v. *Rockwell,* supra, 382.[5] This rule, however, cannot be applied uniformly to every legislative delegation.

The rule pronounced in *State* v. *Stoddard,* supra, involved the delegation of powers from the legislature to an administrator in the executive department who was appointed by the governor. Thus, the *Stoddard* rule clearly is applicable to delegations of authority from the legislative to executive department. Application of the rule, however, to delegations from the state legislature to a municipality, as in the present case, is not appropriate. The bases for the nondelegation doctrine as between the legislative and executive branches of the state government are not coextensive with the bases for nondelegation as between the state legislature and a municipality, and, therefore, the rules governing such delegations are not the same.

The primary basis for the nondelegation doctrine as between the coequal branches of government is the separation of powers doctrine. In the federal system, the foundation of the nondelegation doctrine in the principle of separation of powers under article one, §§ 1 and 8, of the United States constitution[6] has been traced

---

[5] We note that the dissent sets out a number of cases that have referred to *State* v. *Stoddard,* 126 Conn. 623, 13 A.2d 586 (1940). The impression that might be created by this list obfuscates the critical distinction that we make between the delegation of power among coequal departments of state government and the delegation of power from the legislative department to municipalities.

[6] The constitution of the United States, article one, § 1, provides: "All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."

The constitution of the United States, article one, § 8, provides: "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and

to John Locke's Second Treatise of Civil Government, published in 1690. See *Industrial Union Department, AFL-CIO* v. *American Petroleum Institute,* 448 U.S.

Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States;

"To borrow Money on the credit of the United States;

"To regulate Commerce with foreign Nations, and among the Several States, and with the Indian Tribes;

"To establish an uniform Rule of Naturalization, and uniform Laws on the subject of Bankruptcies throughout the United States;

"To coin Money, regulate the Value thereof, and of foreign Coin, and fix the Standard of Weights and Measures;

"To provide for the Punishment of counterfeiting the Securities and current Coin of the United States;

"To establish Post Offices and post Roads;

"To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries;

"To constitute Tribunals inferior to the Supreme Court;

"To define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations;

"To declare War, grant Letters of Marque and Reprisal, and make rules concerning Captures on Land and Water;

"To raise and support Armies, but no Appropriation of Money to that Use shall be for a longer Term than two Years;

"To provide and maintain a Navy;

"To make Rules for the Government and Regulation of the land and naval Forces;

"To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions;

"To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress;

"To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings;—and

"To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."

607, 672–73, 100 S. Ct. 2844, 65 L. Ed. 2d 1010 (1980) (Rehnquist, J., concurring). The United States Supreme Court has made it clear that the concern for separation of powers is the driving force behind the nondelegation doctrine. *Schechter Corporation* v. *United States,* 295 U.S. 495, 529–30, 55 S. Ct. 837, 79 L. Ed. 1570 (1935); *Panama Refining Co.* v. *Ryan,* 293 U.S. 388, 421, 55 S. Ct. 241, 79 L. Ed. 446 (1935); see *Industrial Union Department, AFL-CIO* v. *American Petroleum Institute,* supra, 672–76 (Rehnquist, J., concurring); L. Tribe, American Constitutional Law (2d Ed. 1988) § 5-17; R. Pierce, S. Shapiro & P. Verkuil, Administrative Law and Process (1985) § 3.4; S. Barber, The Constitution and the Delegation of Congressional Power (1975) p. 24.[7]

Similarly, we have recognized the fundamental nature of the separation of powers doctrine of the constitution of Connecticut, article second and article third, § 1,[8] in our nondelegation doctrine. *University of Con-*

---

[7] It is interesting to note the evolution of the nondelegation doctrine in the federal governmental system. Although Justice Rehnquist stated that "[t]he Framers of the Constitution were practical statesmen" who realized that " 'the degree of separation which the maxim requires, as essential to a free government, can never in practice be maintained' "; *Industrial Union Department, AFL-CIO* v. *American Petroleum Institute,* 448 U.S. 607, 673, 100 S. Ct. 2844, 65 L. Ed. 2d 1010 (1980) (Rehnquist, J., concurring), quoting The Federalist No. 48, p. 308 (Lodge Ed. 1888); Professor Davis, in his treatise on administrative law, notes that as recently as 1932 the United States Supreme Court declared a strict construction of the nondelegation doctrine in professing: " 'That the legislative power of Congress cannot be delegated is, of course, clear.' " 1 K. Davis, Administrative Law (2d Ed. 1978) § 3:2, p. 150, quoting *United States* v. *Shreveport Grain & Elevator Co.,* 287 U.S. 77, 85, 53 S. Ct. 42, 77 L. Ed. 175 (1932). In 1940, however, the court realized the necessity for delegation and adopted the view that delegation of legislative power is permissible as long as it is accompanied with "meaningful standards" for its use. 1 K. Davis, supra, § 3:2, pp. 150-51. Professor Davis now suggests that "a statement that standards are no longer required to support congressional delegations is sound for all practical purposes." Id., § 3:2, p. 151.

[8] The constitution of Connecticut, article second, provides: "The powers of government shall be divided into three distinct departments, and each

*necticut Chapter, AAUP* v. *Governor,* supra, 394; *State* v. *Stoddard,* supra, 627; see *Caldor, Inc.* v. *Thornton,* 191 Conn. 336, 343–44, 464 A.2d 785 (1983), aff'd, 472 U.S. 703, 105 S. Ct. 2914, 86 L. Ed. 2d 557 (1985). Although the language of the constitution of Connecticut is more specific than that of the constitution of the United States in separating the coequal branches of government,[9] we too have recognized the practical necessity of the delegation of powers. See *Blue Sky Bar, Inc.* v. *Stratford,* supra; *State* v. *Gordon,* supra.

It was this separation of powers concern, an express requirement of government under our constitution, that guided this court's decision in *Stoddard.* In that case, we stated: "The Constitution of this state provides for the separation of the governmental functions into three basic departments, legislative, executive and judicial, and it is inherent in this separation, since the law-making function is vested exclusively in the legislative department, that the Legislature cannot delegate the law-making power to any other department or agency. In the establishment of three distinct departments of government the Constitution, by necessary implication, prescribes those limitations and imposes those duties which are essential to the independence of each and to the performance by each of the powers of which it is made the depositary." *State* v. *Stoddard,* supra, 627. We held that the standards contained in the challenged statute were not sufficient to pass constitutional mus-

of them confided to a separate magistracy, to wit, those which are legislative, to one; those which are executive, to another; and those which are judicial, to another."

The constitution of Connecticut, article third, § 1, provides: "The legislative power of this state shall be vested in two distinct houses or branches; the one to be styled the senate, the other the house of representatives, and both together the general assembly. The style of their laws shall be: Be it enacted by the Senate and House of Representatives in General Assembly convened."

[9] Compare U.S. Const., art. I, § 1, with Conn. Const., art. II.

ter under the rule we profferred. Since *Stoddard,* this court correctly and consistently has judged other statutory delegations of power from the state legislature to the executive department under that rule. See, e.g., *State* v. *White,* supra; *Kellems* v. *Brown,* supra.

The separation of powers doctrine, however, does not pertain to delegations from the state legislature to a municipality. A municipality cannot be considered "any other department or agency" in the context of that phrase in *Stoddard;* a municipality is not one of the three departments enumerated in the constitution's separation of powers provision.[10] Accordingly, a nondelegation doctrine founded upon the separation of powers doctrine does not pertain by jurisprudential necessity to the delegation of power from the state legislature to a municipality.

Having determined that the constitutional doctrine of separation of powers is not appropriate in the context of a delegation from the state legislature to a municipality, and thus, a nondelegation rule grounded in that constitutional limitation is inapposite, we must now inquire whether there are other sources limiting a delegation from the state legislature to a municipality. One source in Connecticut to which we may turn is found in article third, § 1, of our constitution which vests the legislative power in the state legislature.[11] This source, however, does not appear to be dispositive of this inquiry.

---

[10] This court's discussion in *State* v. *Stoddard,* 126 Conn. 623, 13 A.2d 586 (1940), of delegations among *departments* was in the context of *departments* as used in the separation of powers provision in our state constitution, a point left unaddressed by the dissent. The three departments enumerated in that provision are the legislative, executive and judicial. Municipalities are not *departments* in this sense, and, thus, Stoddard, not only by its language but also by its facts, is limited to delegations among the three coequal branches of our state government.

[11] See footnote 8, supra, for the text of article third, § 1, of the Connecticut constitution.

First, article third, § 1, does not provide an express prohibition on the transfer of power from the state legislature to a municipality. Its phraseology stands in contrast to the requirement of the separation of powers *expressly* stated in article second. Article second expressly divides the powers of government into "three distinct departments," and thus limits the power of each branch of government. Article third, § 1, however, "is a grant and not a limitation of power." *State* v. *Coleman,* 96 Conn. 190, 192, 113 A. 385 (1921); *Bridgeport Public Library & Reading Room* v. *Burroughs Home,* 85 Conn. 309, 319, 82 A. 582 (1912). "The broad grant of the legislative power of the state to the General Assembly, in Article Third, is unqualified . . . ." *State* v. *Coleman,* supra. Therefore, while article third, § 1, expressly vests the legislative power in the General Assembly, it does not prohibit the General Assembly from delegating its legislative power. Indeed, we consistently have held that the state legislature may delegate its authority to municipalities.[12] *Yale University* v. *New Haven,* 104 Conn. 610, 622, 134 A. 268 (1926); see *Blue Sky Bar, Inc.* v. *Stratford,* supra, 19–20; *Aunt Hack Ridge Estates, Inc.* v. *Planning Commission,* supra, 115; *Jennings* v. *Connecticut Light & Power Co.,* supra, 670–71. Thus, the language of article third, § 1, does not provide a sound source for limitation of state to municipality legislative delegations.[13]

---

[12] It would be unwise to suggest that a constitutional provision such as this should prevent every delegation by the state legislature of its enumerated powers. For instance, such a claim would undermine the authority of a municipality to exercise the power of eminent domain which is vital to a municipality's successful operation and which power must be delegated to it from the state legislature. See note, "Municipal Corporations: The Constitutionality of Oklahoma's Central Business District Redevelopment Act," 35 Okla. L. Rev. 821, 822 (1982) ("no legal question exists" as to the state's right to delegate the power of eminent domain to a municipality).

[13] The weakness of a limitation based on the text of article third, § 1, of the Connecticut constitution is bolstered by the current judicial attitude toward the separation of powers doctrine. As explained previously, despite

Another source of limitation of the legislature's power to delegate its authority may emanate from the due process guarantees of article first, § 8, and amendment seventeen to the constitution of Connecticut and the fifth and fourteenth amendments to the United States constitution. See generally S. Barber, supra, p. 30. A delegation of power can be challenged on the ground that the statute is unconstitutionally vague under traditional due process analysis. As we stated previously, to establish unconstitutional vagueness, it must be demonstrated that an ordinary person is not able to know what conduct is permitted or prohibited under the statute. *State Management Assn. of Connecticut, Inc.* v. *O'Neill,* supra; *Gunther* v. *Dubno,* supra. Additionally, "[a] statute is not void for vagueness, however, simply because it may be open to two possible constructions; *Williams* v. *Brewer,* 442 F.2d 657, 660 (8th Cir. [1971]); see *In re Davis,* 242 Cal. App. 2d 645, 652, 51 Cal. Rptr. 702 [1966]; or 'merely because the imagination can conjure up hypothetical situations in which the meaning of some terms may be in question. *American Communications Association* v. *Douds,* 339 U.S. 382, 70 S. Ct. 674, 94 L. Ed. 925 [1950].' *Schiller Park Colonial Inn, Inc.* v. *Berz,* 63 Ill. 2d 499, 513, 349 N.E. 61 [1976]." *McKinney* v. *Coventry,* 176

the explicit prohibition on the delegation of power between the coequal branches of government, the courts have for some time permitted such delegations. Some observers of the relevant federal case law contend that the requirement for standards to guide a recipient of a coequal delegation of power has eroded to virtual nonexistence. See footnote 7, supra. This court also has countenanced broad delegations from the legislature to the executive department. See, e.g., *State* v. *White,* 204 Conn. 410, 419, 528 A.2d 811 (1987). Because the requirement for standards to guide the exercise of delegated authority has been curtailed extensively where there is an express constitutional limitation, there necessarily is even less authority for such standards where a constitutional limitation has to be inferred. Therefore, although we do not at all suggest that article third, § 1, should be read to authorize standardless delegations of legislative authority to municipalities by a civil statute, neither does it require standards as strict as those for delegations between coequal governmental departments.

Conn. 613, 619, 410 A.2d 453 (1979). Further, civil statutes are held to a less stringent standard for vagueness than criminal statutes. *State Management Assn. of Connecticut, Inc.* v. *O'Neill,* supra, 757; *McKinney* v. *Coventry,* supra. Finally, "[a]n imprecise statute . . . may be sufficiently definite if it provides reasonably distinct boundaries for its fair administration." *State Management Assn. of Connecticut, Inc.* v. *O'Neill,* supra, 758; *Keogh* v. *Bridgeport,* supra, 60; *State* v. *Anonymous,* 179 Conn. 155, 164, 425 A.2d 939 (1979).

There is no question that this standard of due process is applicable to a statute delegating power to a municipality; it is applicable to all statutes. *Seals* v. *Hickey,* 186 Conn. 337, 343, 441 A.2d 604 (1982); see L. Tribe, supra, § 12-31. This standard is designed to prevent arbitrary and capricious enforcement of the laws. See L. Tribe, supra; S. Barber, supra, pp. 31–32, quoting R. Cushman, "The Constitutional Status of the Independent Regulatory Commissions," 24 Cornell L.Q. 13, 32–33 (1938).

Therefore, we conclude that the rule limiting the delegation of legislative power between coequal branches of state government is not the appropriate rule to govern the delegation of legislative power from the state to a municipality. The underpinning of the rule governing the former delegation, i.e., separation of powers, is not applicable to the latter delegation. Instead, due process provides the sounder standard to govern the delegation of legislative authority to a municipality. Specifically, the standard is whether the " 'statute afford[s] a person of ordinary intelligence a reasonable opportunity to know what is permitted or prohibited.' " *Seals* v. *Hickey,* supra, 343; *McKinney* v. *Coventry,* supra, 618.[14] Such a rule protects the municipality's

[14] Although it may appear that our holding today merges the nondelegation doctrine and the vagueness doctrine, at least as they apply to delegations of legislative authority to municipalities, this is not the case. While it has been suggested that the nondelegation doctrine and the vagueness

citizenry from arbitrary and capricious enforcement of the state statute.[15]

This standard finds support in legal literature. Most notable is the support in Sutherland's treatise on statutory construction. He states: "[I]n delegating power to municipal corporations none of the limitations imposed on administrative or executive agencies applies. Thus, the delegation may be of the most general nature and

doctrine are similar in many respects, our decision has some basis outside of the due process vagueness limitation. Article third, § 1, of the Connecticut constitution provides additional constitutional support for this standard. Even though we do not find that article third, § 1, mandates a particular standard for delegations of legislative authority, we do find that it supports the standard that we employ in this case. This is not only because it authorized the legislature to enact General Statutes § 7-147, but also because this authority was a grant to the legislature under article third, § 1, and the authority so granted to the legislature must be exercised within the limitations of that grant. Inasmuch as we have stated previously that article third, § 1, does not set out those limitations, any limitation must be found elsewhere in our constitution. As we have indicated, we find that limitation in the due process clause of our constitution.

It is interesting that, in this case, particularly in the plaintiff's complaint and the memorandum of decision, the doctrines of vagueness and nondelegation are intertwined. Paragraph seven of the plaintiff's complaint clearly sets out a vagueness claim citing the fifth and fourteenth amendments to the United States constitution. Paragraph eight of the complaint then sets out five subclaims without citation to constitutional or statutory authority; some, however, relate to due process, such as subsections (a) (vagueness, overbreadth), (c) (taking claims) and (e) (procedural due process). Subsection (b) of paragraph eight is couched in terms of an unconstitutional delegation claim. It is unclear whether the plaintiff intended the authority for allegations in paragraph seven to apply to those in paragraph eight or whether paragraph eight stands separately and, in part, is redundant with paragraph seven.

The trial court's memorandum of decision also seems to synthesize the vagueness and delegation doctrines. The trial court even stated: "Claims of unconstitutional vagueness of a statute, and unconstitutional delegation of legislative power are closely related." The trial court's analysis begins with a discussion of the vagueness doctrine that naturally flows into the delegation doctrine without a demarcation between the two.

[15] Professor Davis argues that the emphasis in limiting delegations of power should not be solely on standards for the exercise of the power, but should be shifted to safeguards following the exercise of that power. 1 K.

it will not be invalid for failure to create an adequate standard." 1 J. Sutherland, Statutory Construction (4th Ed. Sands 1985) § 4.07; 1 C. Antieau, Municipal Corporation Law (1988) § 5.02; 16 Am. Jur. 2d, Municipal Corporations § 351.[16]

Such an approach to delegations by a state to a municipality acknowledges the nature and respective resources of state and local governments. It would not be realistic to assume that the state legislature could address all of the local concerns in the state. It is clear, however, that the municipality cannot legislate to

Davis, Administrative Law (2d Ed. 1978) § 3:14. He suggests that this would better protect against arbitrary action. Id.; see also *Chelmsford Trailer Park, Inc.* v. *Chelmsford,* 393 Mass. 186, 189–90, 469 N.E.2d 1259 (1984). General Statutes § 7-147 does provide safeguards through the incorporation of the zoning appellate process of General Statutes § 8-8 for those aggrieved by a local decision.

[16] Our holding also finds support in case law from other jurisdictions. *People ex rel. City of Canton* v. *Crouch,* 79 Ill. 2d 356, 403 N.E.2d 242 (1980); *People* v. *Moreira,* 70 Misc. 2d 68, 69–70, 333 N.Y.S.2d 215 (1972), citing *Matter of Larkin Co.* v. *Schwab,* 242 N.Y. 330, 151 N.E. 637 (1926) ("Not every case where a legislative power is delegated requires the setting forth of standards to assure a proper exercise of the powers conferred." Discretion in the local body is plenary where the state delegates legislative power to it.); *DePetrillo* v. *Coffey,* 118 R.I. 519, 376 A.2d 317 (1977); *State* v. *Texas Municipal Power Agency,* 565 S.W.2d 258, 273 (Tex. Civ. App. 1978) ("Where the legislature delegates its authority, and establishes broad standards, it may leave to selected municipalities the making of rules and the determination of facts to establish the basis for the application of legislative policy. Such standards may be broad where conditions must be considered which cannot be conveniently investigated by the legislature.").

It is interesting to note that some other jurisdictions which have utilized rules similar to the one announced in *State* v. *Stoddard,* 126 Conn. 623, 13 A.2d 586 (1940), to judge delegations from the state legislature to a municipality also have inappropriately adopted that rule from cases involving legislative to executive delegations. See, e.g., *Metals Recycling Co.* v. *Maccarone,* 527 A.2d 1127, 1129 (R.I. 1987) (adopting rule from administrative delegation case of *Davis* v. *Wood,* 427 A.2d 332, 336 [R.I. 1981]); *Indiana University* v. *Hartwell,* 174 Ind. App. 325, 330–31, 367 N.E.2d 1090 (1977) (adopting rule from administrative delegation case of *State ex rel. Standard Oil Co.* v. *Review Board,* 230 Ind. 1, 101 N.E.2d 60 [1951], and *Schakel* v. *Review Board,* 142 Ind. App. 475, 235 N.E.2d 497 [1968]).

address local concerns until it is authorized to do so by the state. *Buonocore* v. *Branford,* supra; *City Council* v. *Hall,* supra. Thus, in providing local governments with authority to legislate, the state necessarily must grant municipalities the power to act with broad discretion within the framework of the delegated authority. The state legislature may give a municipality the power to " 'fill in the details' " of police power legislation that addresses particularized, local concerns. *New Milford* v. *SCA Services of Connecticut, Inc.,* supra, 149, quoting *Len-Lew Realty Co.* v. *Falsey,* 141 Conn. 524, 528, 107 A.2d 403 (1954). In *Aunt Hack Ridge Estates, Inc.* v. *Planning Commission,* supra, a case involving a delegation of power to a municipality, but applying the rule for legislative to executive delegations, we said: "Obviously, the General Assembly could not prescribe in detail for the countless conditions which might confront the planning commissions in the state's many cities and towns. 'As the complexity of economic and governmental conditions increases, the modern tendency is liberal in approving broad regulatory standards so as to facilitate the operational functions of administrative boards or commissions.' " Id., 115, quoting *Forest Construction Co.* v. *Planning & Zoning Commission,* 155 Conn. 669, 679, 236 A.2d 917 (1967). Similarly, in *State* v. *Kievman,* 116 Conn. 458, 468, 165 A. 601 (1933), a case predating *Stoddard,* we said: "There can be no doubt of the legislature's power to delegate regulatory duties to these [municipal] officers. The practice is usual in such cases and is often the only workable means of administering such a statute." There is no doubt that our society is increasingly regulatory and bureaucratic and thus there can be no doubt that broad legislative delegations of authority, limited by the due process requirement of notice to affected parties of what conduct is permitted and prohibited, are necessary for effective local government.

Now we must apply this standard for state legislature to municipality delegations to the present case. As a threshold matter, we examine the constitutionality of the statutory scheme of General Statutes § 7-147, that is, whether the framework of the statute protected against arbitrary and capricious action by local officials. The operative provision of § 7-147, which is at issue in this appeal, read as follows: "Any town, city or borough may, within its jurisdiction, establish by ordinance lines along any part of any waterway beyond which, in the direction of the waterway, no permanent obstruction or encroachment shall be placed by any private person or any firm or corporation, unless permission is granted in writing by the legislative body of the town, city or borough." In overview, the statute permitted a municipality to prohibit any permanent obstruction or encroachment in a waterway and allowed a municipality to grant exceptions from any such prohibition. This appears to be a rational scheme because the greater power to prohibit all permanent obstructions or encroachments logically would include the lesser power to permit certain obstructions or encroachments that meet criteria prescribed by ordinance. See *Posadas de Puerto Rico Associates* v. *Tourism Co.*, 478 U.S. 328, 345–46, 106 S. Ct. 2968, 92 L. Ed. 2d 266 (1986); *Cicero Lumber Co.* v. *Cicero*, 176 Ill. 9, 24, 51 N.E. 758 (1898); *Blake* v. *Marshall*, 152 Va. 616, 633, 148 S.E. 789 (1929).

In interpreting the scheme of § 7-147 this way, we presume that the phrase "establish by ordinance" pertained to both the prohibition of obstructions and encroachments *and* any exceptions to such a prohibition. More specifically, if a municipality elected to adopt an ordinance prohibiting permanent obstructions or encroachments in waterways within its jurisdiction, and it also desired to permit exceptions to that prohibition, it had to establish by ordinance a constitutionally ade-

quate scheme by which its legislative body would have reviewed claims for exception from the prohibition. This interpretation of the statute is supported by the plain language of § 7-147 and by well settled rules of construction.

First, the language of § 7-147 provided that a municipality could have provided by ordinance that "no permanent obstruction or encroachment shall be placed by any private person or any firm or corporation, *unless* permission is granted in writing by the legislative body . . . ." (Emphasis added.) The phrase authorizing exceptions was introduced by the dependent, subordinate term "unless"; thus, the exception language was dependent on, and subordinate to, the preceding phrase that authorized a prohibition by ordinance. Because "unless" has been defined to mean "except on the condition that"; N. Webster, Third New International Dictionary; we conclude that the term "unless" as used in the statute provided for an exception. Therefore, a logical grammatical interpretation of the sentence is that the dependent exception phrase was governed by the earlier proviso in the sentence that municipal action under the statute had to be accomplished by ordinance.

Furthermore, this interpretation is consistent with well settled rules of statutory construction. The alternative to our interpretation that both the prohibition of obstructions and encroachments and the process for exceptions to such a prohibition had to be prescribed by local ordinance is that only the prohibition needed to be prescribed by ordinance and the exceptions would have been decided on an ad hoc basis at the whim of the local legislative body. This latter alternative doubtless would have been unconstitutional because it would have been susceptible, even prone, to arbitrary and capricious enforcement by the municipality in violation of the due process guarantees of the state and federal constitutions. We have stated previously: " '[W]here

a statute reasonably admits of two constructions, one valid and the other invalid on the ground of unconstitutionality, courts should adopt the construction which will uphold the statute . . . .' " *Lublin* v. *Brown,* 168 Conn. 212, 219–20, 362 A.2d 769 (1975), quoting *Adams* v. *Rubinow,* 157 Conn. 150, 153, 251 A.2d 49 (1968); *Kellems* v. *Brown,* supra, 486; *Ferguson* v. *Borough of Stamford,* 60 Conn. 432, 447, 22 A. 782 (1891). Whenever the constitutionality of a statute is challenged, we must attempt to find reasonable grounds upon which it can be upheld. *Blue Sky Bar, Inc.* v. *Stratford,* supra, 23; *Rules Committee of the Superior Court* v. *FOIC,* 192 Conn. 234, 240, 472 A.2d 9 (1984); *Grega* v. *Warden,* 178 Conn. 207, 210, 423 A.2d 873 (1979); *State* v. *Gordon,* supra. We assume that the legislature intended to achieve a purpose by an enactment that meets constitutional requirements. *Patry* v. *Board of Trustees,* 190 Conn. 460, 470, 461 A.2d 443 (1983); see *Bridgeport Bowl-O-Rama, Inc.* v. *Zoning Board of Appeals,* 195 Conn. 276, 283, 487 A.2d 559 (1985). Therefore, we disregard this alternative interpretation of § 7-147 as illogical and presume that the legislature intended the constitutional interpretation whereby both the prohibition and standards for exceptions to the prohibition had to be established by ordinance.

We now turn to a discussion of whether those terms in § 7-147 that authorized a prohibition, and any exception to the prohibition, were constitutionally adequate. We conclude that they were.

General Statutes § 7-147 permitted a municipality to prohibit all permanent obstructions and encroachments within waterway protection lines. In this way, residents of Westport, and any other municipality, were on notice that the town could have prohibited any activity that would permanently have obstructed or encroached on a waterway. We conclude that the language of § 7-147

was sufficient to put an ordinary person on notice of what conduct could and could not have been engaged in under the law.[17]

Connecticut courts previously have established definitions for "obstruct" and "encroachment." The words are not, at least in this situation, terms of art or in any way obscure. In *Hartford Electric Light Co.* v. *Water Resources Commission,* 162 Conn. 89, 100, 291 A.2d 721 (1971), we stated: "Black's Law Dictionary (Rev. 4th Ed.) defines 'encroachment' as a 'fixture . . . which illegally intrudes into or invades the highway or encloses a portion of it.' Webster's Third New International Dictionary defines 'encroachment' as the 'act or action of encroaching.' The word 'encroach' means 'to enter . . . by stealth into the possessions or rights of another.' " We further explained that this definition is applicable to rivers as well as highways. Id., 101.

The Superior Court has defined "obstruct" to mean " 'to block up . . . or close up: place an obstacle or fill with obstacles or impediments to passing.' " *DeLeo* v. *Orlando,* 29 Conn. Sup. 107, 109, 273 A.2d 725, (1971), quoting N. Webster, Third New International Dictionary. Webster defines "obstruction" as "an act of obstructing or the condition of being obstructed." Similarly, the term "waterway" is a term amenable to common understanding.

From the plain meaning of these terms, we conclude that an ordinary person was put on notice of what activ-

---

[17] In its memorandum of decision, the trial court stated: "Here [General Statutes] § 7-147 would be valid if it gave municipalities the authority to prohibit *all activities* within waterway lines established by the ordinance." (Emphasis added.) We disagree that it was necessary for the statute to prohibit *every* activity possible within the ordinance lines to put the community on proper notice of what conduct was illegal. A prohibition of only those activities that permanently obstructed and encroached was sufficient to put an ordinary person on notice of what was permissible. A requirement prohibiting any and all activity would have been suspect constitutionally under an overbreadth analysis.

ity could have been prohibited under § 7-147. Whether a prohibition on obstructions and encroachments was enacted and what standards would have been used to establish exceptions under the statute were left to the municipal legislative body. It is that body that has the expertise to decide those questions of purely local concern. Of course, those ordinances had to pass constitutional muster in their own right. See *In re Opinion of the Justices,* 128 A. 181, 185 (Me. 1925). In this appeal, we do not address the constitutionality of the WPLO because the trial court did not rule upon it.

In summary, the proper standard for a delegation of power from the state legislature to a municipality, based on both constitutional analysis and the reality of state and local governmental relations, is that such a delegation should be judged by whether it provides reasonable notice of what conduct may be authorized or prohibited under its provisions. We hold that § 7-147 did provide sufficient notice under this standard and, therefore, that the trial court erred in holding the statute unconstitutional. The question remains, however, of whether the ordinance established under the authority of § 7-147 is constitutional.

There is error, the judgment declaring General Statutes § 7-147 unconstitutional is set aside and the case is remanded to the trial court with direction to determine whether the Westport Waterway Protection Lines Ordinance is constitutional.

In this opinion PETERS, C. J., SHEA and GLASS, Js., concurred.

COVELLO, J., dissenting. I respectfully disagree with the majority view. After forty-eight years as a worthy beacon in a sea of abstraction, our holding in *State* v. *Stoddard,* 126 Conn. 623, 13 A.2d 586 (1940), has been effectively overruled by the majority's having limited

its future applicability to the narrow range of cases that deal with delegations of power as between "the coequal branches of government," i.e., the legislative, executive or judicial. This is not what *Stoddard* said nor is this the limitation that we have placed upon it in the cases that have followed.

We began our analysis in *Stoddard* by stating that "[t]he Constitution of this state provides for the separation of the governmental functions into three basic *departments,* legislative, executive and judicial, and it is inherent in this separation, since the law-making function is vested exclusively in the legislative *department,* that the Legislature cannot delegate the law-making power to any other *department* or *agency."* (Emphasis added.) Id., 627. We went on to say, however, "[i]n order to render admissible such delegation of legislative power, however, it is necessary that the statute [1] declare a legislative policy, [2] establish primary standards for carrying it out, or [3] lay down an intelligible principle to which the *administrative officer* or *body* must conform . . . ." (Emphasis added.) Id., 628.

It seems clear to me that when we described the coequal branches of government in *Stoddard,* we used exclusively the word "department." Yet when we went on to articulate the important principles which, as this majority noted, have thereafter served as "a canon of interpretation for virtually all delegations of legislative power," we made them applicable not only to "department[s]," but also to "agenc[ies]," "administrative officer[s]," and "bod[ies]." I submit that it is therefore reasonably inferable that *Stoddard* intended a universal applicability to include all legislative delegations of powers and not simply delegations of power as between the coequal branches of government, i.e., delegations of power founded upon the separation of powers doctrine, as the majority today declares.

Since our ruling in *Stoddard,* we have referred to its analysis forty-seven times on a variety of delegation of powers issues.[1] We have never once suggested that its applicability was limited to legislative delegations of power between the coequal branches of government. Even if the majority's analysis is correct as to the initial limitation on its applicability, I submit that our ensuing global application of the *Stoddard* principles has enlarged its applicability to include delegations of power by the state to municipalities and muncipal agencies.

Having swept aside *Stoddard* (presumably because General Statutes § 7-147 could not have withstood constitutional analysis based upon the application of the *Stoddard* principles), the majority adopts a much less precise due process standard and examines § 7-147 to ascertain whether the " 'statute afford[s] a person of

---

[1] We have decided forty-seven cases that have referred to or relied upon the *State* v. *Stoddard,* 126 Conn. 623, 13 A.2d 586 (1940) analysis. Twenty-two of them have dealt with the delegations of power to a municipality or a municipal agency. *Carofano* v. *Bridgeport,* 196 Conn. 623, 495 A.2d 1011 (1985); *Beccia* v. *Waterbury,* 192 Conn. 127, 470 A.2d 1202 (1984); *Patry* v. *Board of Trustees,* 190 Conn. 460, 461 A.2d 443 (1983); *New Haven Commission on Equal Opportunities* v. *Yale University,* 183 Conn. 495, 439 A.2d 404 (1981); *New Milford* v. *SCA Services of Connecticut, Inc.,* 174 Conn. 146, 384 A.2d 337 (1977); *Zenga* v. *Zebrowski,* 170 Conn. 55, 364 A.2d 213 (1975); *Mitchell* v. *King,* 169 Conn. 140, 363 A.2d 68 (1975); *Zoning Commission* v. *Tarasevich,* 165 Conn. 86, 328 A.2d 682 (1973); *Aunt Hack Ridge Estates, Inc.* v. *Planning Commission,* 160 Conn. 109, 273 A.2d 880 (1970); *Howell* v. *Johnson,* 147 Conn. 290, 160 A.2d 486 (1960); *Clark* v. *Town Council,* 145 Conn. 476, 144 A.2d 327 (1958); *Wilson Point Property Owners Assn.* v. *Connecticut Light & Power Co.,* 145 Conn. 243, 140 A.2d 874 (1958); *Calve Bros. Co.* v. *Norwalk,* 143 Conn. 609, 124 A.2d 881 (1956); *Wilson* v. *West Haven* 142 Conn. 646, 116 A.2d 420 (1955); *Len-Lew Realty Co.* v. *Falsey,* 141 Conn. 524, 107 A.2d 403 (1954); *Gohld Realty Co.* v. *Hartford,* 141 Conn. 135, 104 A.2d 365 (1954); *Jennings* v. *Connecticut Light & Power Co.,* 140 Conn. 650, 103 A.2d 535 (1954); *Strain* v. *Zoning Board of Appeals,* 137 Conn. 36, 74 A.2d 462 (1950); *Bishop* v. *Board of Zoning Appeals,* 133 Conn. 614, 53 A.2d 659 (1947); *Devaney* v. *Board of Zoning Appeals,* 132 Conn. 537, 45 A.2d 828 (1946); *New Haven* v. *New Haven Water Co.,* 132 Conn. 496, 45 A.2d 831 (1946); *Murphy, Inc.* v. *Westport,* 131 Conn. 292, 40 A.2d 177 (1944).

ordinary intelligence a reasonable opportunity to know what is permitted or prohibited.' " *Seals* v. *Hickey,* 186 Conn. 337, 343, 441 A.2d 604 (1982), quoting *McKinney* v. *Coventry,* 176 Conn. 613, 618, 410 A.2d 453 (1979). Having examined the common meaning of the statute's key language, the majority concludes "that an ordinary person is put on notice of what activity may be *prohibited* under General Statutes § 7-147." (Emphasis added.) It is not what is prohibited that renders the statute unconstitutional. It is what is authorized that does so. As the trial court correctly noted, § 7-147 authorizes an *exemption* from its declared prohibitions by obtaining "permission . . . in writing [from] the legislative body of the town . . . ." The statute is totally silent as to what circumstances will authorize the town to issue the required permission. The majority concludes that it is constitutionally permissible to leave this question to be answered by local ordinance. I submit that such a standardless delegation of authority is not permitted.

In *New Milford* v. *SCA Services of Connecticut, Inc.,* 174 Conn. 146, 384 A.2d 337 (1977), we were confronted with a challenge to the constitutionality of General Statutes (Rev. to 1977) § 7-161 which authorized the establishment of garbage treatment plants after municipal permission was obtained from a "commission composed of the director of health and selectmen of the town in which such plant is to be located . . . ." The statute was silent as to the applicable criteria which would guide the commission in making its determination. Having applied a *Stoddard* analysis, we did not hesitate to find the statute unconstitutional and concluded that "[i]n conferring discretionary power upon the commission, the legislature has not only failed to provide reasonably adequate and definite guidance for the commission to pass upon an application for a statutory permit, but a reading of § 7-161 reveals the total

absence of any standards which the local commission is to apply." *New Milford* v. *SCA Services of Connecticut, Inc.,* supra, 149–50. This is precisely the case with respect to § 7-147.

I would find no error.